UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CLARICOM NETWORKS, L.L.C., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 04 C 4906 |
| ) | Judge George M. Marovich |
| ILLINOIS BELL TELEPHONE COMPANY ) | |
| d/b/a/ SBC ILLINOIS, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Claricom Networks, L.L.C. ("Claricom") filed a twelve-count complaint against defendant Illinois Bell Telephone Company d/b/a/ SBC Illinois ("SBC"). In its complaint, Claricom asserts violations of the Communications Act, 47 U.S.C. § 151 et. seq., and various state law claims, including breach of contract, misrepresentation, conversion, tortious interference, negligence and unjust enrichment. Defendant moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for an order dismissing plaintiff's claims. For the reasons set forth below, the Court grants in part and denies in part defendant's motion to dismiss.

I.  **Background**

Congress passed the Telecommunications Act of 1996 to "'promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies.'" *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 393 (7th Cir. 2000) (quoting *Preamble to Telecommunications Act of 1996*). Sections 251 and 252 of the Telecommunications Act set out duties of carriers to interconnect. Under § 251, a local exchange

carrier ("LEC") is required to resell telecommunications services on reasonable and nondiscriminatory terms, to provide number portability, to provide dialing parity, to afford access to rights-of-ways and to establish reciprocal compensation arrangements. 47 U.S.C. § 251(b). In addition to those requirements, an incumbent local exchange carrier ("ILEC") must also negotiate in good faith agreements to carry out the duties of § 251(b), provide unbundled access on reasonable and nondiscriminatory terms, and provide at wholesale rates to competitors any services they offer at retail. 47 U.S.C. § 252(a). Any interconnection agreement reached between an ILEC or LEC and a reseller must be approved by the relevant state commission. 47 U.S.C. § 252(e). Once approved, the ILEC must make the same services available to any other telecommunications carrier upon the same terms and conditions as are provided in the interconnection agreement. 47 U.S.C. § 252(i).

For purposes of this motion to dismiss, the Court takes as true the allegations in the complaint. The Court also considers the interconnection agreement referenced in and attached to plaintiff's complaint. The interconnection agreement may be considered by the Court without converting the motion to dismiss into a motion for summary judgment because the document is referenced in the amended complaint, is relevant to plaintiff's claims and does not require discovery to authenticate or disambiguate. *Tierney v. Vahle*, 304 F.3d 734, 739 (7th Cir. 2002).

As alleged in the complaint, the relevant facts are as follows. Claricom is a Delaware limited liability company with its principal place of business in Oklahoma City, Oklahoma. SBC Illinois is an Illinois corporation with its principal place of business in Illinois. Both Claricom and SBC are common carriers for purposes of the Communications Act of 1934, 47 U.S.C. § 151, et. seq.

SBC is an ILEC in Illinois. SBC sells telephone exchange services on a retail basis to its own customers and on a wholesale basis to resellers such as Claricom. Claricom is a Certified Local Exchange Carrier ("CLEC"). Claricom does not own or operate any telecommunications facilities of its own. Rather, it purchases telephone exchange services from SBC (among others) and resells those telephone exchange services. In 1998, Claricom began purchasing and reselling SBC services according to the terms of an interconnection agreement attached to the complaint.

Claricom alleges that it marketed certain services and acquired certain customers in Illinois. Certain of Claricom's customers had previously executed with SBC agreements that included term and minimum usage commitments. Claricom claims that SBC required it to assume the term and minimum usage commitments made by Claricom's customers. SBC ultimately won back some of the customers by (1) using Claricom's confidential, proprietary information and (2) offering those customers retail packages superior to the service and rates SBC made available to Claricom on a wholesale level. SBC has demanded that Claricom continue to pay the full amount of any minimum usage commitment for customers who were once Claricom customers but are now SBC customers.

Claricom implies in its complaint that it stopped paying for these services. It alleges that SBC informed Claricom by letter in June 2004 that SBC would disconnect services to Claricom if Claricom failed to pay billed amounts by mid-June 2004. In addition, SBC stopped processing additional Claricom service orders.

Claricom alleges that after SBC sent the June 2004 letter, the parties negotiated a "standstill agreement." Under the standstill agreement, Claricom agreed to make payments to

SBC, and SBC agreed to produce information to Claricom about the Claricom customers SBC "won back" and about shortfall and termination charges. SBC has not produced the data.

Based on these allegations, Claricom asserts twelve claims, including ten state law claims, over which the Court has jurisdiction pursuant to 28 U.S.C. § 1332. In Counts I and II, Claricom asserts violations of 220 ILCS 5/9-250 and 220 ILCS 5/13-514. In Count III, Claricom alleges that SBC violated § 201 of the Communications Act by assessing shortfall and/or termination charges, misusing confidential information and failing to negotiate billing in good faith. In Count IV, Claricom alleges that SBC violated § 222 of the Communications Act by failing to protect the confidentiality of Claricom's proprietary information. In Count V, Claricom alleges that SBC breached the interconnection agreement. Counts VI through XI allege, respectively, misrepresentation, conversion, tortious interference with contract, intentional interference with prospective business expectancy, negligence and unjust enrichment. In Count XII, Claricom alleges that SBC billed it amounts in excess of those set out in the interconnection agreement.

## II. Standard on a motion to dismiss

The Court may dismiss claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure if the plaintiff fails "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). In considering a motion to dismiss, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. *McCullah v. Gadert*, 344 F.3d 655, 657 (7th Cir. 2003). On a motion to dismiss, the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."

*Cole v. U.S. Capital, Inc.*, 389 F.3d 719, 724 (7th Cir. 2004) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

### III. Discussion

#### A. Economic loss doctrine

Defendant seeks to dismiss Counts VI through X (plaintiff's claims for misrepresentation, conversion, tortious interference with contract, intentional interference with prospective business expectancy and negligence) on the grounds that they are barred by the economic loss doctrine. In this diversity action, the parties agree that Illinois law applies to the state common-law claims. The duty of a federal court considering a diversity case is "to predict what the state's highest court would do if presented with the identical issue." *Taco Bell Corp. v. Continental Casualty Co.*, 388 F.3d 1069, 1077 (7th Cir. 2004).

In *Moorman v. National Tank Co.*, the Supreme Court of Illinois concluded that damages for economic losses could not be recovered on certain tort claims, including strict liability, negligence and innocent misrepresentation. *Moorman v. National Tank Co.*, 435 N.E.2d 443 (Ill. 1982). There, the Supreme Court of Illinois noted that economic losses include "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits–without any claim of personal injury or damage to other property." *Moorman*, 435 N.E.2d at 449. As the court explained in *Moorman*, the remedies for such economic losses are found in contract law. 435 N.E.2d at 450. Tort remedies, by contrast, are generally for property damage or physical injury. *Id.*

Generally, the Supreme Court of Illinois has allowed plaintiffs to recover economic losses on tort claims only where the "defendant owes a duty in tort to prevent precisely the type of

harm, economic or not, that occurred." *2314 Lincoln Pk. West Condo. Assoc. v. Mann, Gin, Ebel & Frazier, Ltd.*, 555 N.E.2d 346, 352 (Ill. 1990). The Supreme Court of Illinois has already concluded that plaintiffs may recover damages for economic losses on certain tort claims, including tortious interference with contract and intentional interference with prospective business relationship. *2314 Lincoln Pk. West*, 555 N.E.2d at 352. Accordingly, the court rejects defendant's argument that Counts VIII and IX should be dismissed due to the economic loss doctrine.

With respect to misrepresentation claims, Illinois allows the recovery of economic losses only on claims for intentional misrepresentation or negligent misrepresentation made by one who is in the business of supplying information for the guidance of others. *Moorman*, 435 N.E.2d at 452. Here, plaintiff's misrepresentation claim does not allege that SBC knew that its allegedly false statements were false. Accordingly, plaintiff's claim is for *negligent* misrepresentation. See *Prime Leasing v. Kendig*, 773 N.E.2d 84, 94 (1st Dist. 2002). Because plaintiff has not alleged that SBC was in the business of supplying information, the claim will not support a demand for economic losses. It is clear from plaintiff's complaint that Claricom seeks nothing but economic losses in its misrepresentation claim. Claricom complains that the result of SBC's alleged misrepresentation was that SBC used Claricom's confidential information to solicit and take away Claricom's customers, i.e., that Claricom lost profits. Nowhere in Claricom's misrepresentation claim does it allege property damage. Accordingly, the Court grants defendant's motion to dismiss Count VI.

In its conversion claim (Count VII), Claricom alleges that SBC converted Claricom's customer list and then used the list as a marketing tool to solicit and take away Claricom's

customers. Here, Claricom seeks the same damages it seeks in its other claims, and those damages are for lost profits. Nowhere does plaintiff seek damages for lost or damaged property or physical injury. The Court sees no reason why the Supreme Court of Illinois would not apply the *Moorman* doctrine to plaintiff's conversion claim. *See Dunkin Donuts Inc. v. N.A.S.T. Inc.*, 266 F. Supp.2d 826, 831 (N.D. Ill. 2003); *Daredia v. Gold & Diamond Merchants Grp.*, Case No. 97 C 8149, 1999 WL 965591 at *4 n. 10 (N.D. Ill. Sept. 30, 1999). Thus, the Court dismisses Count VII.

Similarly, in Count X (plaintiff's negligence claim), plaintiff fails to allege any damages other than the same lost profits it alleges in each of its other claims. Accordingly, the Court dismisses Count X.

### B. Filed rate doctrine

Defendant also argues that Counts I-IV and VI-XII of plaintiff's complaint are barred by the filed rate doctrine, also known as the filed tariff doctrine. In order to promote the goal of nondiscriminatory rates, the filed rate doctrine seeks to prevent common carriers (originally railroads but eventually telecommunications carriers as well) from charging anything other than the rate filed with and approved by a regulatory agency. The filed rate doctrine applies also to interconnection agreements, such as the one in this case, that are filed and approved by state commissions. See *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000); *Verizon Delaware, Inc. v. Covad Comm. Co.*, 377 F.3d 1081, 1083 & 1089 (9th Cir. 2004).

As the Supreme Court explained long ago, the "rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." *Keogh v. Chicago & N.W. Ry. Co.*,

260 U.S. 156, 163 (1922). The Court concluded that to allow the recovery of certain damages against the carrier would necessarily lead to rate discrimination:

> If a shipper could recover under section 7 of the Anti-Trust Act for damages resulting from the exaction of a rate higher than that which would otherwise have prevailed, the amount recovered might, like a rebate, operate to give him a preference over his trade competitors.

*Keogh*, 260 U.S. at 163. "[E]ven if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff." *AT&T Co. v. Central Office Telephone, Inc.*, 524 U.S. 214, 222 (1998) (citing *Kansas City Southern R. Co. v. Carl*, 227 U.S. 639, 653 (1913)). Thus, claims that seek to reduce or eliminate charges spelled out in the tariffs are barred. See *Bryan v. Bellsouth Comm., Inc.*, 377 F.3d 424, 431-432 (4th Cir. 2004) (state unfair business practices claim based on failure to disclose universal service charge billed by telecommunications carrier was barred by filed rate doctrine because it would refund a portion of a rate to some but not all customers and require the court to determine a reasonable rate); *Hill v. Bellsouth Telecom., Inc.*, 364 F.3d 1308, 1316-17 (11th Cir. 2004) (same).

Furthermore, the doctrine bars not just claims seeking rates different from the tariff, but also privileges not in the tariff. As the Supreme Court has explained:

> Rates, however, do not exist in isolation. They have meaning only when one knows the services to which they are attached. Any claim for excessive rates can be couched as a claim for inadequate services and vice versa. 'If "discrimination in charges" does not include non-price features, then the carrier could defeat the broad purpose of the statute by the simple expedient of providing an additional benefit at no additional charge . . . An unreasonable "discrimination in charges," that is, can come in the form of a lower price for an equivalent service or in the form of an enhanced service for an equivalent price.'

*Central Office*, 524 U.S. at 223 (citing *Competitive Telecom. Assn. v. FCC*, 998 F.2d 1058, 1062 (D.C. Cir. 1993)). In *Central Office*, the Court concluded that the plaintiff's claims–whether couched in contract or tort language–based on promises of services outside the tariff were barred by the filed rate doctrine. Similarly, in *Goldwasser*, the Seventh Circuit concluded that consumers' claims "boil[ed] down to a claim for overcharges Ameritech has been able to impose upon them, as a result of its failure to carry out its responsibilities under the 1996 Act" and, thus, the claims were barred by the filed rate doctrine. 222 F.3d at 402. There, the plaintiffs claimed, among other things, that Ameritech failed to provide the same quality service to competitors, failed to provide adequate access to Ameritech's facilities, continued to bill customers who had converted to competitors' services and subjected competitors to undue delays.

Still, while the filed rate doctrine prevents entities from seeking to enforce agreements to provide rates or services other than those in the filed rate, the filed rate doctrine does not bar claims to *enforce* the terms of the filed rate. *Verizon Delaware, Inc. v. Covad Comm. Co.*, 377 F.3d 1081, 1090 (9th Cir. 2004).

The Court now applies these principles to plaintiff's claims.

*Minimum usage charges*

One set of claims in Claricom's complaint seeks to hold SBC accountable for allegedly requiring Claricom to pay minimum usage charges. As Claricom describes the situation, when Claricom began reselling SBC's telecommunications services, Claricom "acquired" customers who had previously purchased services directly from SBC and who had previously "executed agreements with SBC that included term and minimum usage commitments to SBC." Claricom alleges that when it acquired those customers, "Claricom was required by SBC to assume these

minimum usage and term commitments." Absent from the complaint is any allegation stating whether the usage and term commitments were part of the interconnection agreement or were side agreements. Claricom alleges that ultimately SBC won back some of those customers but continued to bill Claricom for the minimum usage charges. It is this continued billing that is the basis for Claricom's claims in Counts I, II, III and XI.

At this time, the Court cannot conclude that Counts I, II, III and XI of plaintiff's complaint are barred by the filed rate doctrine. It is unclear from plaintiff's complaint whether the alleged term and minimum usage commitments are set out in the interconnection agreement. The answer is critical. If the term and minimum usage commitments are part of the interconnection agreement, then Claricom's attempts to obtain damages for having paid those fees are clear attempts to receive discounts from the filed rate and are, as such, barred by the filed rate doctrine. If, on the other hand, the term and minimum usage commitments are separate from the interconnection agreement, then Claricom's claims might be more properly thought of as attempts to *enforce* the interconnection agreement—claims which are not barred by the filed rate doctrine.

Because it is not clear from the allegations in plaintiff's complaint that Counts I, II, III and XI are barred by the filed rate doctrine, the Court declines at this stage to dismiss the claims on that ground.

*Confidential information claim*

In Count IV, Claricom alleges that SBC violated § 222(a) of the Communications Act, 47 U.S.C. § 222(a) by improperly using Claricom's proprietary information in its marketing efforts.

Specifically, plaintiff alleges that defendant misused Claricom's confidential proprietary information to turn Claricom's customers into its own.

SBC argues that this claim is barred by the filed rate doctrine because "the handling of confidential information" is "set forth in great detail in the" interconnection agreement.[1] The flaw in defendant's argument is that plaintiff is not attempting to enforce an unenforceable side agreement to change the services or rates in the interconnection agreement. While the filed rate doctrine prevents Claricom from bringing tort or contract claims that would effectively change the rate of telecommunications services, it does not prevent Claricom from asserting claims for conduct that is illegal independently of the interconnection agreement. *Access Telecom, Inc. v. MCI Telecom. Corp.*, 197 F.3d 694, 711 (5th Cir. 1999). There, the Fifth Circuit concluded that tortious interference claims based on allegations that the defendant released confidential information were not barred by the filed rate doctrine. The Fifth Circuit explained:

> This claim is not derivative of a contract claim. It does not concern the provision of services which are covered by the filed tariff, but rather it concerns illegal actions outside the scope of the tariff and not derivative of any phone services.

*Access Telecom*, 197 F.3d at 711. Likewise, Claricom's claim under § 222 of the Communications Act is based on duties outside the scope and independent of the interconnection agreement. Thus, Count IV is not barred by the filed rate doctrine, and the Court declines to dismiss it.

---

[1] To the contrary, the interconnection agreement merely states that the parties will comply with § 222 of the Communications Act, which the parties must do regardless of any contract or interconnection agreement.

*Interference claims*

In Counts VIII and IX, Claricom alleges that SBC tortiously interfered with its contracts and intentionally interfered with its prospective business expectancy. Both claims allege that SBC injured Claricom by directly marketing its services to Claricom's customers, directly billing Claricom's customers and by converting Claricom's customers into SBC customers. These allegations are not attempts to obtain rates or services contrary to the interconnection agreement. Accordingly, the Court rejects defendant's argument that the claims are barred by the filed rate doctrine.

*Overbilling claim*

In Count XII, plaintiff alleges that SBC billed it for amounts over and above those due under the interconnection agreement. The claim appears not to be an attempt to change rates or services under the interconnection agreement. Rather, the claim appears to be an attempt to *enforce* the interconnection agreement. Accordingly, the Court rejects defendant's argument that Count XII is barred by the filed rate doctrine.

**C.     Breach of Contract**

Defendant also moves to dismiss Count V of plaintiff's complaint on the grounds that plaintiff fails to state a claim upon which relief may be granted.

In Count V, plaintiff alleges that SBC violated the interconnection agreement. Defendant argues that plaintiff cannot state a claim for breach of the interconnection agreement without alleging that it complied with the terms of a subsequent standstill agreement, which defendant attaches to the motion to dismiss. The Court will not consider the attached standstill agreement

on a motion to dismiss.[2] Furthermore, the Court notes that plaintiff has alleged that it complied with the terms of the interconnection agreement, which is all that is required to state a claim for breach of the interconnection agreement.

Accordingly, the Court denies defendant's motion to dismiss Count V.

### D. Illinois Public Utilities Act

In a perfunctory footnote in its opening brief and in a more-developed paragraph in its reply brief, defendant suggests that Counts I and II should be dismissed because the relevant state statutes do not provide private rights of action until after one has filed an administrative proceeding. Generally, courts deem waived any argument that are made in such footnotes and/or not made until reply briefs. *See To-Am Equip. Co. v. Mitsubishi Caterpillar Forklift America, Inc.*, 152 F.3d 658, 663 (7th Cir. 1998); *Hamilton v. Spraying Sys., Inc.*, Case No. 02-C-9093, 2004 WL 2191330 at *4 (N.D. Ill. Sept. 28, 2004). That is because it is unfair not to give the opposing party an adequate opportunity to argue in favor of the claim.

Accordingly, the Court denies defendant's motion to dismiss Counts I and II on the grounds that plaintiff lacks a private right of action to bring the claims. Defendant, however, is granted leave to file within 14 days a second motion to dismiss Counts I and II on these grounds and a memorandum of law of no more than five pages. Should defendant choose to file such a motion, plaintiff is granted 14 days to file a response brief of no more than five pages, and defendant is granted 5 days to file a reply brief of no more than four pages.

---

[2]The Court cannot consider the document without converting the motion to a motion for summary judgment because the document requires authentication. *See Tierney v. Vahle*, 304 F.3d 734, 739 (7th Cir. 2002).

## IV. Conclusion

For the reasons set forth above, the Court grants in part and denies in part defendant's motion to dismiss. The Court denies plaintiff's motion with respect to Counts I, II, III, IV, V, VIII, IX, XI and XII. The Court dismisses without prejudice Counts VI, VII and X of plaintiff's complaint. Because the defects may be curable, the Court grants plaintiff leave to file an amended complaint within 21 days. Finally, the Court grants defendant leave to file within 14 days a motion to dismiss Counts I and II on the grounds that plaintiff lacks a private right of action and to file a memorandum of law of no more than five pages. If defendant files such a motion, plaintiff is granted 14 days to file a response brief of up to five pages, and defendant is granted five days to file a reply brief of up to four pages.

ENTER:

/s/ George M. Marovich
George M. Marovich
United States District Judge

DATED: March 17, 2005